UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ALLAHRAE FOX,<br><br>  Petitioner,<br><br>  v.<br><br>STU SHERMAN,<br><br>  Respondent. | No.  2:15-cv-2561 JAM GGH P<br><br>FINDINGS AND RECOMMENDATIONS |

*Introduction and Summary*

    Petitioner seeks to have his conviction for sexual offenses with a minor vacated in habeas corpus for the following reasons:

1. Insufficient Evidence With Respect to Forcible Oral Copulation Count;
2. Prejudicial Evidence Regarding Prior Prison Commitments;
3. Prejudicial Evidence of Prior Bad Acts;
4. Reference of Trial Judge to Petitioner's Custody Status and Posting of Sheriff at the Defense Table.

    Although problematic events took place at petitioner's trial, none rise to the level of actionable AEDPA error.  The petition should be denied.

*Background Facts*

The facts set forth by the Court of Appeal set forth the background here:

A jury found defendant Michael Allahrae Fox guilty of six offenses committed against his stepdaughter on a single occasion. (Pen.Code, §§ 243.4, subd. (a)1 [counts 1, 2, & 5, felony sexual battery by restraint], 243.3, subd. (e)(1) [count 3, misdemeanor sexual battery], 288a, subd. (c)(2)(A) [count 6, felony oral copulation by force or fear], 647.6, subd. (a) [count 4, misdemeanor molestation].) The trial court sentenced him to 14 years in prison, and he timely appealed.

The victim's mother testified she married defendant in 2005, after dating him "off and on" for a couple of years. She had three children. The victim was her middle child, having been born in 1996. The mother met defendant while buying marijuana and used methamphetamine with him. In 2005, the victim was present when her mother and defendant used drugs. Defendant was sometimes violent with her, and the victim saw this. The victim saw him threaten her brother with a knife, and he threatened the victim with a knife twice, once when she was 14 and the once when she was 15. Defendant threw the victim across the room once, and once tried to hit her in the head with a baseball bat. When the victim was 14, the mother took the children and hid in the garage one night because defendant said he was going to kill them all. The victim told her mother she hated defendant and she could do better, but sometimes seemed to get along with him. More than once, the mother called the police to have defendant arrested.

At one point in 2010 or 2011, the victim called her mother at work and reported that defendant had offered to let her home school "if she let him eat her pussy." The mother threw defendant out of the house, but eventually let him return when the victim said it was okay, after seeing her mother was "crying all the time." After that when the mother argued with the victim, the victim was angry that defendant had been allowed back into the home. The weekend after Thanksgiving 2012, the victim called her mother at work, crying, and said defendant had touched her sexually and she was not going back home. The mother went home, saw defendant acting like nothing had happened, except he appeared to be high on methamphetamine, and she called the police. About 20 minutes later, she saw the victim, who was very upset. The mother had two felony convictions for crimes involving moral turpitude, in 1988 and 2005.

The victim testified she was 16 and had known defendant since she was 8. She had seen him smack her mother in the face many times. Once, before the victim turned 16, defendant pushed her mother, causing her to hit her face and cut her eye. Defendant would hit the victim in the mouth, and he would hit her with belts, wires, and other objects if she was being disrespectful or disobedient. He threatened her with a weapon five or six times, and threatened her brother with a

2

kitchen knife. Twice he threatened her life, although without a weapon in hand. She had seen him pull knives, a fork, a screwdriver, and sticks on other people. He was "angry and violent" toward family members, which was "scary." Once he told her they could go into the bathroom with knives and whoever came out alive could have her mother. She often saw him use methamphetamine, and "his lips get all white and dry and cracked, and he gets all jittery."

Just before the victim turned 14, defendant came into her room when she was in her underclothing and asked if she had had sex. When she said she was virgin, defendant asked if she thought about having sex, and asked if he could put his tongue and mouth on her vaginal area, and she told him this made her uncomfortable and she wanted to leave. She told an older friend about this, but was afraid to tell her mother, but after a couple of weeks did so. Defendant left the house the next day, but this made her mother sad, and he returned a week later, after the victim told her mother it was okay. A month or two later, defendant reminded the victim of what he had said and told her "the offer still stands," and if she "ever wanted an orgasm, to go to him." She did not tell her mother, because her mother loved defendant. There were other violent instances with defendant after that, but nothing else sexual until the instant offenses.

On November 24, 2012 defendant referred to her mother's "jealousy trip," and then made reference to the victim's "skinny jeans" and the sexual comment he had made to her two years before. He said he had had to leave the house earlier while the victim was showering because he fantasized about coming into the shower with her, and said when he was in bed with her mother he sometimes fantasized about the victim, and after saying how beautiful she was, told the victim, "if it was a life sentence for messing with me, he would take it." However, he told her he would only do anything if she allowed it. He then said "if I caught him looking at my buttocks or my vaginal area, not to think of him like a pervert." He said he was not a pedophile, and she was the only girl he felt that way about, and he had had feelings for her since he met her, which was when she was 8 years old or younger. She planned to tell her mother about what happened but did not want to tell anybody else because "I felt dirty."

Later, the victim went home to get a skateboard, after first sending her aunt to get it, without success. Defendant gave her the skateboard and then put his arms around her, referred to what they had been discussing and asked her repeatedly if he could touch her buttocks. His lips were white and cracked and he was jittery, so she thought he was on methamphetamine. When he is on that drug "[h]e gets more violent and there's no stopping him." Finally she asked him if he would let her leave if she let him touch her, and "he told me yeah, so I let him" and he began

3

rubbing her buttocks (count 3, misdemeanor sexual battery). Then he repeatedly said he wanted to touch her breasts. Again, she asked if he would let her go if she allowed him to touch her, and he said he would, then he touched one breast, then pulled it out of her bra and mouthed it, then said he had to do both, so he did the same to her other breast (count 1, felony sexual battery). She "just wanted to leave. I don't like violence. I get tired of it." He then said she had a "pretty little mouth" and wanted to show her how a grown man kissed, and asked for her tongue so he could show her, then he proceeded to kiss her (count 4, misdemeanor child molestation).  He kept asking her if she wanted him as badly as he wanted her, and she said no, he was a father figure and it "was just gross." She started to walk to the door, but he put his arms around her again and said her "pussy" was probably "pretty and little and fat" and he wanted to touch it, and he reached out and closed the door partly. She did not scream because "[n]obody was around who was going to hear me." He then touched her vagina under her pants (count 5, felony sexual battery), and although the door was open slightly, she did not call out because she "was stuck, like froze." He told her she had to touch him so he would not be the only one getting in trouble. He had pulled his penis out and she touched it, while he had one arm around her and the other holding his penis (count 2, felony sexual battery). Then he wanted her to put her mouth on it, and she said no, but he said "he wanted me to do it" and she did (count 6, oral copulation by force or fear). Defendant "put ... my head down there and I just put my mouth on the tip of it and pulled back." He held her while he put his penis in his pants and made her promise not to tell anyone. When her boyfriend called, she was afraid to tell him what had happened for fear he would attack defendant and be arrested for assault, so she said she would be over as soon as she could. Defendant then closed the door all the way when she reached for the doorknob, and "just made me promise that I wouldn't tell" anybody, and asked if it bothered her if he went upstairs and "jack[ed] off" thinking about her. He said he wanted to "spoon" with her the next day her mother was at work.

She left after promising not to tell anybody. She asked a friend if she could stay with her, but did not tell her boyfriend why, again because she was afraid he would attack defendant. She called her mother and told her she was sorry because defendant had done it again. Her boyfriend heard the conversation, and as she had predicted, became angry. He and some other youths went back and fought with defendant until police arrived.

The victim was five foot two inches tall, and defendant was about six inches taller. The victim thought he was circumcised, and knew the difference, but "wasn't paying much attention to [his penis] but I saw a darker line on the tip of it."

4

> The defense consisted of two stipulations. First, photographs showed defendant's penis. They appear to show he is uncircumcised, but also show a dark circumferential line, and it does not appear his penis is fully erect. Second, on June 6, 2010, when officers responded to claims defendant made sexual comments, the victim told them: "My mom is upstairs with that mother fucker. I hate her, too. There ain't no way I'm going back there. [¶] I want him out of here. She kicked him out for like a week and now he's back. I hate that mother fucker."
>
> The People argued the victim was credible, and submitted out of fear based on defendant's prior lewd comments and acts of violence. They added her credibility was enhanced by the fact that she did not make the offenses seem worse, such as by claiming defendant used a weapon or made an explicit threat, and because of her demeanor (crying) afterwards. The defense argued the victim hated defendant, and wanted to get rid of him, and pointed out he was uncircumcised, bolstering the view that she lied.
>
> The jury found defendant guilty as charged.

People v. Fox, 2014 WL 3696696  *1-3 (Cal. App. 2014).

***AEDPA Standards***

The AEDPA standards pose a formidable barrier for petitioner in this case.  They are as follows:

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> Pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the meritsin State court proceedings unless the
> adjudication of the claim-
>
>    (1)   resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
>    (2)   resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have

5

been 'adjudicated on the merits.'" Harrington v. Richter, 562 U.S. 86, 98 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 99, *citing* Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Harrington, supra, at 101, *citing* Williams v. Taylor, 529 U.S. 362, 410 (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 101, *citing* Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id at 102.  "Evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

1  decision that was based on an unreasonable determination of the facts in light of the evidence
2  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in
3  §2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the
4  factual error must be so apparent that "fairminded jurists" examining the same record could not
5  abide by the state court factual determination.  A petitioner must show clearly and convincingly
6  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

7       The habeas corpus petitioner bears the burden of demonstrating the objectively
8  unreasonable nature of the state court decision in light of controlling Supreme Court authority.
9  Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state
10  court's ruling on the claim being presented in federal court was so lacking in justification that
11  there was an error well understood and comprehended in existing law beyond any possibility for
12  fairminded disagreement."  Harrington, supra, at 102.  "Clearly established" law is law that has
13  been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S.
14  120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as
15  clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not
16  permitting state sponsored practices to inject bias into a criminal proceeding by compelling a
17  defendant to wear prison clothing or by unnecessary showing of uniformed guards does not
18  qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).
19  The established Supreme Court authority reviewed must be a pronouncement on constitutional
20  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules
21  binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

22       The state courts need not have cited to federal authority, or even have indicated awareness
23  of federal authority in arriving at their decision.  Id. at 8.  Where the state courts have not
24  addressed the constitutional issue in dispute in any reasoned opinion, the federal court will
25  independently review the record in adjudication of that issue.  "Independent review of the record
26  is not de novo review of the constitutional issue, but rather the only method by which we can
27  determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson,
28  336 F.3d 848, 853 (9th Cir. 2003).

Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; the issue is reviewed de novo under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012). However, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, __U.S.__ , 133 S.Ct. 1088, 1091 (2013).

***Discussion***

    A. Insufficient Evidence Regarding Oral Copulation Perpetrated by Force or Fear

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.2005). Sufficient evidence supports a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). "After AEDPA, we apply the standards of Jackson with an additional layer of deference." Juan H., 408 F.3d at 1274. Moreover, petitioner's challenge to the sufficiency of evidence based on credibility of the witnesses is not cognizable in an insufficient evidence claim. See McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir.1994); see also Schlup v. Delo, 513 U.S. 298, 330 (1995) (recognizing that the credibility of witnesses is generally beyond the scope of sufficiency of the evidence review).

Petitioner asserts that there was insufficient evidence concerning his forcible oral copulation count protesting that the victim was incredible, but should be believed when she testified: "He didn't force me." Amended Petition at 5, ECF 7.

The Court of Appeal disagreed with respect to the "incredible" argument:

> Defendant next asserts the victim's testimony describing forced oral copulation falls within that rare category of evidence that is inherently improbable and therefore cannot be deemed credible. We disagree.
>
> "We review the whole record in a light most favorable to the judgment to determine whether it contains substantial evidence, i.e., evidence that is credible and of solid value, from which a rational trier of fact could find beyond a

reasonable doubt that the accused committed the offense." (*In re Ryan D*. (2002) 100 Cal.App.4th 854, 859.) "Evidence is sufficient to support a conviction only if ... it ' "reasonably inspires confidence" ' ... and is 'credible and of solid value.' " (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

Generally, the testimony of a single witness is sufficient to prove even a disputed fact. (*See People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) However, "[t]he trier of the facts may not believe impossibilities." (*Hicks v. Reis* (1943) 21 Cal.2d 654, 660; *see People v. Ozene* (1972) 27 Cal.App.3d 905, 910.) " 'To warrant the rejection by a reviewing court of statements given by a witness who has been believed by [the fact-finder], there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear.' " (*People v. Jones* (1970) 10 Cal.App.3d 237, 247.)

In closing argument, defendant emphasized that the victim claimed defendant was circumcised, but that the photographs showed otherwise. In rebuttal, the prosecutor emphasized the victim saw the penis briefly, and argued the depictions of it in the photographs were not as clear-cut as trial counsel argued.

On this record, the jury could rationally believe the victim. She was a 16-year-old girl who testified she did not want to look at defendant's penis, and therefore the fact, if it be a fact, that she was in error about whether or not defendant was circumcised amounts to a mere conflict in the evidence, and does not show that she lacked credibility or that her testimony was impossible or inherently improbable. That the victim may have misperceived whether defendant's penis was circumcised or not was a discrepancy well within the discretion of the jury to resolve, and does not come close to showing that her testimony was legally insufficient.

Defendant urges it is "highly unlikely" that the victim, who had a boyfriend, would not be able to correctly describe defendant's penis. But there was no evidence the victim ever had sex with her boyfriend—or anybody else—or had ever even seen her boyfriend's penis, nor whether her boyfriend was circumcised. The victim testified she knew what circumcision was, but tried not to look at defendant's penis. That she may have been mistaken about the whether he was circumcised does not make her testimony incredible. (See People v. Troutman (1921) 187 Cal. 313, 315.)[5]

[Footnote 5][ Defendant also argues the victim's testimony regarding defendant's use of force was inconsistent as to this count. It is well-settled that even dramatic inconsistencies in testimony do not render that testimony incredible per se. We leave the duty of evaluating the credibility of witnesses to the jury absent a few exceptional circumstances, none of which is evident from this record.]

People v. Fox, at *7-8.

The opinion is well stated and reasonable. Moreover, as set forth above, an insufficiency argument based on the credibility of a witness is generally off limits. A reasonable jurist could find the evidence sufficient in this case.

However, petitioner put a one line argument before the state supreme court, and in the federal petition here, that he never *forced* the victim to engage in an act of oral copulation (the most serious count of conviction). See ECF 7 at p.5. The transcript possibly supplies the impetus for his allegation RT 344-345. However, petitioner misses the point. This is why the prosecutor based her case on a "fear" argument—an alternative basis for conviction under Cal. Penal Code section 288(a)(c)(2) (A) (referenced in the transcript as section 288(A)(C)(2), RT 433, *but see* CT 133 showing the jury instruction given referencing the correct section). As shown in the factual background, and also by virtue of the issues raised by petitioner regarding the voluminous amount of "bad act" evidence, the primary theory of the case was that the oral copulation was accomplished because of the fear of physical harm petitioner had imparted to the victim. E.g., RT 467-468.[1] The evidence of fear, both demonstrated by violent acts on the victim as well as other family members, fueled in large part by methamphetamine, was certainly sufficient. Indeed, even petitioner believes it was "over the top," see *infra*, and hence sufficient.

This claim should be denied.

B. <u>Issues 2 and 3—Prejudicial Evidence Regarding Prior Prison Commitments and Prior Bad Acts</u>

Petitioner complains that a witness (the victim's mother) let slip information about prior prison time petitioner had served, as well as a plethora of evidence demonstrating that petitioner was a violent person. Included in the prior bad acts were all the times petitioner had sought to make sexual advances to the victim, even when she was a young as 14 years old. Petitioner even had told the victim that it would be worth a "life sentence" if she would only have sexual relations with him. RT 319.

---

[1] The prosecutor also argued that petitioner's directing of the victim's head to his penis was the "force" necessary for conviction. However, this seemed to be a secondary theory given the emphasis on the prior "bad act" evidence which made petitioner appear like an act of violence was ready to explode, at least with respect to persons petitioner felt he could physically dominate.

10

1    The Court of Appeal considered these claims in a lengthy analysis.  However, the
2    undersigned will not set forth this analysis here in that federal AEDPA law is clear—petitioner's
3    contentions do not set forth a cognizable federal claim.
4    This court is bound by the pronouncement of the Court of Appeal that no prejudice
5    accrued under state law.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To the extent that
6    ineffective assistance under federal law requires a misfeasance or malfeasance -- recognized as a
7    violation of established Supreme Court authority -- petitioner's claim fails.  Holley v.
8    Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (recognizing that the Supreme Court has not
9    found a due process violation by the introduction of prejudicial evidence).  See also Greel v.
10   Martel, 2012 WL 907215 (9th Cir. 2012); White v. Davey, 2016 WL 7404761 (E.D. Cal. 2016)
11   *10; Marks v. Davis, 2016 WL 5395958 *14 (N.D. Cal. 2016); Mermer v. McDowell, 2016 WL
12   5329263 (C.D. Cal. 2016).
13   All claims regarding prejudicial evidence should be denied.
14   C. Statement Regarding Petitioner's Custody Status and Positioning of a Court Bailiff
15   Petitioner contends here, as he did in the Court of Appeal, that the trial judge's
16   unexplained statement to the jury that petitioner was "in custody," and that a bailiff was seated
17   next to him, was error.  The trial judge also gave an admonition to the jury set forth below
18   regarding this statement.  However, as found by the Court of Appeal, petitioner's trial counsel did
19   not object to any of this; hence it was barred from review.  Respondent asserts procedural default
20   in the Answer; petitioner filed no traverse contesting this assertion.  Although the trial judge's
21   actions, unexplained as they were, are problematic, the failure of defense counsel to object at trial,
22   and petitioner's non-assertion of a meritorious cause and prejudice for this failure, requires the
23   undersigned to recommend a dismissal of this claim based on procedural default.
24   The Court of Appeal accurately described the events:

> The trial court instructed prospective jurors in part as follows:
> "The defendant is in custody in this matter. While court is in session, a custody
> officer from the Sacramento Sheriff's Department will be seated by the defendant
> at all times. You must not consider the presence of a custody officer or the
> defendant's custody status for any purpose."

11

First, contrary to defendant's view, the contention of error is forfeited as trial counsel did not object to the instruction and seek empanelment of new prospective jurors to cure any possible harm.3

[fn3][This instruction was not even discussed on the record, much less objected to, and we do not know whether it was discussed during the unreported discussions to which the trial court referred. The better practice is for the court to make no reference to a defendant's custody status unless defense counsel requests that reference be made, or it is otherwise necessary. When reference is made by instructing the jury or in any other manner, the court should place its reasons for doing so on the record.]

Nor does counsel point to any answers of seated jurors that indicated they misunderstood this instruction or any indication that the seated jury misunderstood the post-trial instructions on the People's high burden of proof and the presumption that defendant was innocent.

Defendant cites cases involving defendants appearing before a jury in jail clothing or visibly shackled or gagged. None of those cases are comparable, as here defendant was not visibly restrained, and the record does not show that he appeared in jail clothing. Nor is this a case where multiple officers are near or surrounding the defendant, conveying the impression that the defendant presents a physical danger, nor a case where an officer stands guard while a defendant testifies. (*Cf. People v. Hernandez* (2011) 51 Cal.4th 733, 742–744 (*Hernandez* ).) Here, a single officer was seated by defendant, the trial court explained this was a normal procedure, and trial counsel did not view the explanation as prejudicial.

Defendant appears to contend it is impermissible for a trial court to adopt a policy of having a security officer sitting beside a defendant in the courtroom, and must make special findings justifying such practice in each case. We question this proposition. (*See People v. Stevens* (2009) 47 Cal.4th 625, 634 ["we have consistently upheld the stationing of security or law enforcement officers in the courtroom"]; *People v. Duran* (1976) 16 Cal.3d 282, 291, fn. 8 ["Unless they are present in unreasonable numbers, such presence [of armed guards] need not be justified by the court or the prosecutor"].) But even if we agreed, it is "well settled ... 'that the use of physical restraints in the trial court cannot be challenged for the first time on appeal.' " (*People v. Ward* (2005) 36 Cal.4th 186, 206.)  Had defendant wanted a record of the reasons for the presence of the security officer, he should have objected, and then those reasons could have been placed on the record, or a hearing could have been held if defendant contested the reasons given. Absent a timely objection, we decline to assume the trial court ordered the officer's presence arbitrarily, or assume that the officer's presence caused prejudice, particularly given the trial court's clear admonition to the jury to disregard the officer's presence.

Further, any error would be harmless, as there is no indication the presence of the officer affected the jury's consideration of the evidence and instructions in any

12

way. (*See Hernandez, supra*, 51 Cal.4th at pp. 746–748 (requiring that the defendant show actual prejudice where an officer stood by a testifying defendant, absent a record showing need).

People v. Fox at * 3-4.

Here as stated above, the Court of Appeal found the matter procedurally barred on the basis of the state law rule that an objection must be made to custody status and the like; the unexplained review decision of the California Supreme Court will be presumed to adopt this explained basis. Ylst v. Nunnemaker, 501 U.S. 797, 802-803 (1991). Nor does it make any difference that the Court of Appeal decided the issue in the alternative on the merits. Harris v. Reed, 489 U.S. 255, 264 n.10 (1989). This independent and adequate procedural decision precludes review on the merits by this federal court.[2]

> "A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " [Beard v].Kindler, 558 U.S., at ––––, 130 S.Ct, [612] at 615 (quoting *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. See [*Wainwright v.*] Sykes, 433 U.S. [72] at 81–82, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594.
> * * *
> To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." *Kindler*, 558 558 U.S., at ––––, 130 S.Ct., at 618 (internal quotation marks omitted).FN4 [omitted] "[A] discretionary state procedural rule," we held in *Kindler*, "can serve as an adequate ground to bar federal habeas review." *Ibid*. A " 'rule can be firmly established' and regularly followed,' " *Kindler* observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Ibid*. California's time rule, although discretionary, meets the "firmly established" criterion, as *Kindler* comprehended that requirement.

Walker v. Martin, 562 U.S. 307, 315-316 (2011) (abrogating Townsend v. Knowles, 562 F.3d 1200 (9th Cir.2009)).

The Ninth Circuit has recognized and applied California's contemporaneous objection rule, which provides that a criminal defendant must make a timely objection to the admission of evidence or other objectionable item at trial in order to preserve a claim challenging that

---

[2] The undersigned will not present an alternative recommendation on the merits as the issue is so clearly precluded from review.

13

1  evidence/statement on appeal, as grounds for denying a federal habeas corpus claim under the
2  doctrine of procedural default where there was a failure to object at trial.  See, e.g., Fairbanks v.
3  Alaska, 650 F.3d 1243, 1256 (9th Cir. 2011); Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th
4  Cir. 2005); Paulino v. Castro, 371 F.3d 1083, 1092–1093 (9th Cir. 2004); Melendez v. Pliler, 288
5  F.3d 1120, 1125 (9th Cir. 2002) (citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir.
6  1981)); Vansickel v. White, 166 F.3d 953, 957 (9th Cir. 1999); Bonin v. Calderon, 59 F.3d 815,
7  842–843 (9th Cir. 1995).  See also MacDonald v. Paramo, 2016 WL 1670524 (E.D. Cal. 2016).
8  Under the contemporaneous objection rule, California courts broadly construe the sufficiency of
9  objections that preserve issues for appellate review, focusing on whether the trial court had a
10 reasonable opportunity to rule on the merits of the objection.  Melendez, 288 F.3d at 1125.

11       Respondent has asserted procedural default in the Answer concerning the failure to object
12 to the in-custody remark, or the stationing of court security personnel in proximity to petitioner;
13 petitioner has failed to controvert it in a traverse, either challenging its independence and
14 adequacy, or by seeking an exception to procedural default, i.e., cause and prejudice, or even
15 demonstrating it to be a gross miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722,
16 750 (1991).  Assuming there to be an error, it is procedurally barred from review.

17       Nevertheless, despite petitioner's silence on the matter, and to foreclose this issue from
18 being raised for the first time on objections, the undersigned has reviewed the issue from the
19 standpoint of gross miscarriage of justice, and finds none.  As the Court of Appeal set forth in its
20 footnote 3, the trial judge's procedure was certainly out of the ordinary.  A judge should not sua
21 sponte inform the jury that a person dressed in civilian clothing is, in fact, in custody.  This
22 figuratively dresses the defendant back in prison garb, which was the entire point of what not to
23 wear, at least from a compelled standpoint, as held in Estelle v. Williams, 425 U.S. 501, 512
24 (1976).  Perhaps the trial judge felt that he had to make this statement to explain to the jury why a
25 security officer was to be seated next to the defendant, but he certainly should have advised
26 counsel outside the presence of the jury of what he had planned to do in this regard.

27       The judge's actions also have to be taken in the context of the case.  Here there was to be
28 admitted much evidence of petitioner's violent past acts, thus the in-custody statement and

14

statement about the security officer might well have made it seem to the jury a current corroboration that petitioner was indeed a violent person prone to striking out in anger. Moreover, this was not simply a case of having more than the usual number of security officers present in court; it was a case where the security officer was to be seated right next to the defendant.

Although troubling, the above acts of the trial court did not occasion a gross miscarriage of justice where a probably innocent person was convicted. The jury was given a strong admonition, and the law presumes that the jurors followed this instruction.[3] Most importantly, regardless of any confusion by the victim about petitioner's anatomy, the testimony as a whole presented by the prosecution was credible and overwhelming.

In sum, the failure to object to the trial judge's actions regarding statements about petitioner being "in custody" and the seating of security officers proximate to petitioner results in a default of this issue.

*Conclusion*

The petition should be denied and no Certificate of Appealability (COA) should issue.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are

////

////

////

////

---

[3] The Court of Appeal stated that there was no indication that the jurors were affected by the trial judge's actions. It is not clear, however, precisely how the jurors would express dissatisfaction or disagreement with the situation either openly in court or in inadmissible evidence about what transpired during jury deliberations.

advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 9, 2017

/s/ Gregory G. Hollows<br>UNITED STATES MAGISTRATE JUDGE